STONE & DOWNER CO. *v.* UNITED STATES (NO. 3673)[1]

United States Court of Customs and Patent Appeals, March 5, 1934

*Barnes, Richardson & Halstead* (*Joseph Schwartz* of counsel) for appellant.
*Charles D. Lawrence*, Assistant Attorney General (*Robert C. O'Grady* and *Ralph Folks*, special attorneys, of counsel), for the United States.

[Oral argument December 7, 1933, by Mr. Richardson and Mr. Folks]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

In this case there was imported for the use of the Cathedral of the Immaculate Conception, at Portland, Me., certain parts of an altar rail and bishop's throne which had been donated to the cathedral. It is shown by the record that these were made of marble. The collector

[1] T. D. 46945.

classified them under paragraph 233 of the Tariff Act of 1922, as manufactures of marble. They were claimed by the importer to be free of duty under paragraph 1674, which is as follows:

PAR. 1674. Altars, pulpits, communion tables, baptismal fonts, shrines, or parts of any of the foregoing, and statuary, imported in good faith for presentation (without charge) to, and for the use of, any corporation or association organized and operated exclusively for religious purposes.

The protest claimed, also, that the imported articles were free of duty under the provisions of paragraph 1707 of said tariff act, as works of art. However, that claim was abandoned in the trial court. The United States Customs Court overruled the protest.

The record shows that the particular articles imported consisted of a balustrade, a part of the altar railing to be used in a portion of said railing surrounding the sanctuary, a base for the same, a canopy of a bishop's throne, and a replacement arm for the same. The controversy here is whether the balustrade and base therefor constitute parts of a communion table or tables, and whether the parts of the bishop's throne constitute parts of a pulpit.

Reverend George P. Johnson, rector of said cathedral for 10 years, was the only witness called, and he testified as to the character and use of the imported articles. From his testimony, and from photographs and a plat introduced in evidence, it appears that in this cathedral the altar rail separating the sanctuary from the main body of the church consists of a low portion, about 3 feet high, surrounding the portion immediately in front of the sanctuary, and a higher portion, about 6 feet in height, extending from this low portion back as far as the sanctuary extends. This high portion is found on both sides of the sanctuary. In front of the low portion of the railing are two steps upon which worshipers may kneel while partaking of communion. There are no steps at the base of the high portions, there being aisles adjoining these.

Father Johnson stated that while this rail was properly an altar rail, the front part of it was used as a communion rail, and at other times for the distribution of the candles, holy ashes, palms, etc. He stated that the back high portion was intended for similar uses, if the number of people desiring to enter into these services was sufficient, and at such time it was intended to place steps around the base of this higher portion; that it was not ordinarily done because of the desire to keep the aisles open. He further stated that it was not necessary for the worshiper to kneel while partaking of communion. We are of opinion that, for the purposes of this statute, this altar rail, with its base, may be considered as an entirety, and that it should be so classified. We can see no clear distinction between the term "communion tables" and "communion rail." If there is a distinction in the definition, the use is the same, and the general term,

"communion tables", we believe, was intended to cover all such furniture in a church. Therefore, we are of opinion that these portions of the rail in question were free of duty under the claimed paragraph 1674. The United States Customs Court, in *Hill* v. *United States*, T.D. 44847, 59 Treas. Dec. 1008, speaking through Evans, J., expressed the same opinion.

The parts of the bishop's throne present a somewhat more difficult question. We have no information as to the size or weight of this throne, except what is furnished by the photograph provided. From this it will be seen that a platform, evidently of marble, having two ascending steps, is provided, upon which is built the throne in question. This is an elaborately carved structure, evidently extending upward toward the roof of the cathedral many feet, with an elaborate stone canopy, above, attached to, and a part of it, and having three seats, the center seat being elevated to a considerable distance above the two seats on the sides. That it is a permanent fixture may be judged from the testimony of Father Johnson, who states:

The bishop's throne is the official seat of the bishop in the sanctuary, which he occupies when he celebrates in an official manner and in a solemn manner. It is prescribed that he have in his cathedral a throne that is cathedra. This throne, as it is called, is used when the bishop officiates officially and solemnly and he preaches from the throne. This is the bishop's official pulpit.

It appearing that this is prescribed, it would seem reasonable to follow that this fixture is permanent. It is also shown that this throne is placed within the sanctuary, and it appears from the testimony of Father Johnson that the bishop, when in the cathedral during services, occupies this seat, and that, on occasions when he preaches to the congregation, he preaches therefrom. All his official communications to his congregation are made from this station. Father Johnson states that in 17 years he has heard the bishop preach from his throne at least 80 or 90 times. It is further stated that no one else can occupy this throne but the bishop.

In addition, it is stated by this witness that there is a pulpit consisting of a raised platform enclosed by a railing within the sanctuary, from which the priest preaches his sermons. The witness also stated, on several other occasions when interrogated, that in his church, and according to the practice of his faith, the bishop's throne was his pulpit. There is no testimony in the record to the contrary. No suggestion is made that this witness is not entirely competent and qualified to testify on this subject.

It is argued, however, that the testimony of Father Johnson is not conclusive, as it is merely testimony as to the common meaning of the word "pulpit." This is true, but the court may, and should, con-

sider this testimony in arriving at its understanding of what the term "pulpit", as used in the paragraph in question, means. Various lexicographers give the following definitions of the work "pulpit":

Webster's New International Dictionary, 1932:

pulpit. 1. An elevated place, or enclosed stage, in a church, in which the clergyman stands while preaching and from which in churches of many denominations he conducts the services.

Encyclopaedia Britannica, 14th edition:

Pulpit. A raised platform with enclosed front, whence sermons are delivered.

Oxford Dictionary:

Pulpit. 2. A raised structure consisting of an enclosed platform, usually supplied with a desk, seat, and other accessories, from which the preacher in church or chapel delivers the sermon, and in which in some denominations the officiating minister conducts the service.

The New Century Dictionary and Cyclopedia:

Pulpit. 1. A rostrum or elevated platform from which a speaker addresses an audience or delivers an oration; specifically in the Christian church, an elevated and more or less inclosed platform from which the preacher delivers his sermon and, in churches of many denominations, conducts the service.

New International Encyclopaedia:

Pulpit. A piece of church furniture used for the delivery of sermons. In the first Christian ages, when the bishops were practically the only preachers, they delivered their addresses from the episcopal throne at the end of the apse; hence a pulpit is called *chaire* in French to this day. Then the ambo (q.v.) was sometimes used for this purpose, and later the jube or rood-loft between the choir and nave. By the eleventh or twelfth century small movable pulpits had been introduced, which could be brought out at the time of the sermon; and by degrees the modern pulpit, generally on one side of the nave, was evolved.

Funk & Wagnalls' New Standard Dictionary, 1931:

pulpit. 1. An elevated stand or desk in a church, to hold the books and manuscript used by a preacher in discoursing; such a desk with the platform on which it rests, and stairs, seats, and other accessories. In an older form it is a high enclosure, often with a canopy. In some churches it is of small dimensions, upheld by a pillar-bracket, or standing on a pedestal; rarely, it is like an interior balcony, reached by an exterior stairway.

Upon consideration of these definitions, no reason appears why the bishop's throne should not be held to be a pulpit. It is upon a raised platform within the sanctuary of the church, and, so far as the record shows, is a permanent fixture used by the bishop in official communications and sermons to his congregation.

While it may be the practice, in some churches, to have but one pulpit in a church or cathedral, no reason is apparent why two may not be provided. In the above definition, particular interest is attached to that given by the New International Encyclopaedia, from which it plainly appears that from the earliest days in the

Christian church such a throne, or chair, has been the pulpit of the bishop of the cathedral.

Reference is made in the opinion of the court to the case of *Bell* v. *United States*, Abstract 7460, in which decision a lectern was held to be not a pulpit. That case, in our opinion, does not hold to the contrary of our views hereinabove stated, for it has not been contended, as we view it, that the word "lectern" has any common meaning from which we could deduce that it was a pulpit or a part thereof. Webster defines a lectern as follows:

1. Chair, desk, or reading desk in some churches from which the lections, or scripture lessons are chanted or read.

In our opinion, the parts of the bishop's throne imported in this case should be classified as parts of a pulpit. In view of our conclusions, we find it necessary to, and do hereby, *reverse* the judgment and *remand* the case to the United States Customs Court for further proceedings, in conformity with the views herein expressed.

### DISSENTING OPINION

BLAND and LENROOT, Judges, dissenting in part: We are in accord with the majority as to classification of the communion rail and the base for the same. The low part of the altar rail was classified by the collector as free of duty. The part of the communion rail involved here and its base is a part of the whole communion rail imported, and the whole thing should be regarded as an entirety.

We find ourselves very much in disagreement with the conclusions of the majority as to the so-called "throne", and feel compelled to state, as briefly as possible, the grounds of such disagreement.

There is no question but that paragraph 1674 should receive a liberal construction to bring about the purposes which Congress intended. *United States* v. *Buffalo Society of Natural Sciences et al.*, 15 Ct. Cust. Appls. 1, T.D. 42128; *Benziger* v. *United States*, 192 U.S. 38. But, there must be some language used which can be so construed. It is our position that there is no language in paragraph 1674 which, when liberally construed, covers the bishop's throne. The word "pulpit" is the only word claimed to cover the throne, and if it does cover it, it is by reason of the common meaning of the term "pulpit" as found in the dictionaries and lexicographical authorities.

With the hope of finding some definition of the word "pulpit" which would cover the imported throne, and at the same time respond to the intent that Congress had when it used the term, search in every available quarter has been made and no definition (not obsolete) of the word "pulpit" has been found that in any way fits the throne at bar. Surely, a proper definition of the word "pulpit" as used by Congress ought to be found in Webster's New International Diction-

ary, or Funk & Wagnalls New Standard Dictionary, and we quote, from these authorities, all that could possibly apply to the throne:

Webster's New International Dictionary, 1932:

pulpit. 1. An elevated place or enclosed stage, in a church, in which the clergyman stands while preaching and from which in churches of many denominations he conducts the services. * * * 3. A desk, or platform, for a public speaker, a reader, or the like. *Rare.*

Funk & Wagnalls New Standard Dictionary, 1931:

pulpit. 1. An elevated stand or desk in a church, to hold the books and manuscript used by a preacher in discoursing; such a desk with the platform on which it rests, and stairs, seats, and other accessories. In an older form it is a high enclosure, often with a canopy. In some churches it is of small dimensions, upheld by a pillar-bracket, or standing on a pedestal; rarely, it is like an interior balcony, reached by an exterior stairway. * * * 5. [Archaic] A rostrum for a public speaker or lecturer.

It will be observed that there are but two general meanings given to the word "pulpit" in common use in this country. One is an elevated place or enclosed stage in a church in which the clergyman stands while preaching. That definition does not fit the throne involved here and it is not claimed by the majority that it is such a pulpit or a part of such a pulpit. The anomalies which would result from a holding that it is a part of the place where a clergyman stands while preaching are at once apparent.

The second definition of a pulpit is that a pulpit is a desk or an elevated stand for holding the books, etc., of a clergyman while preaching. It would be hard to believe that the majority held the bishop's throne to fall within this definition.

The opinion of the majority states:

Upon consideration of these definitions, no reason appears why the bishop's throne should not be held to be a pulpit. It is upon a raised platform within the sanctuary of the church, and, so far as the record shows, is a permanent fixture used by the bishop in official communications and sermons to his congregation.

A raised platform of a certain kind, together with its furnishings, may be a pulpit in one sense, but the fact that the chair at bar sits on a raised platform does not make the chair a pulpit. Neither does the fact that the bishop preaches from a chair make the chair a pulpit within any of the definitions which should be accepted as conveying the meaning intended by Congress.

The majority has quoted from, and points specially to, the New International Encyclopaedia, 1910, as follows:

Pulpit. A piece of church furniture used for the delivery of sermons. In the first Christian ages, when the bishops were practically the only preachers, they delivered their addresses from the episcopal throne at the end of the apse; hence a pulpit is called *chaire* in French to this day. Then the ambo (q.v.) was sometimes used for this purpose, and later the jube or rood-loft between the choir and nave. By the eleventh or twelfth century small movable pulpits had been intro-

duced, which could be brought out at the time of the sermon; *and by degrees the modern pulpit, generally on one side of the nave, was evolved.* (We italicize the last clause.)

A pulpit may be called a "chaire" in French, and a bishop's throne may be called a "chaire" in French, but a throne is not commonly called a pulpit in this country. The importer called the chair "Bishop's throne" in the entry papers.

The majority calls attention to the fact that Father Johnson stated that the bishop's throne was a pulpit. We are sure the majority does not feel that such a statement is controlling in the classification of the involved article. The same witness also testified as follows:

A. I began an entire renovation of the cathedral, from the painting and the floors and everything pertaining to the building, and that involved the placing of new altars, altar rails, pulpit, *bishop's throne in the pulpit*, and the Stations of the Cross—in fact an entire renovation of the cathedral. (Italics ours.)

He did not state that the bishop's throne was called a pulpit, but said that the throne *was* a pulpit. He also testified that there was a pulpit in the church from which the priest preached. Obviously, it was not a chair. He also stated that he put the bishop's throne *in the pulpit*.

No reason appears why Congress did not put "bishops' thrones" in paragraph 1674, or why Congress might not have used a general phrase such as "and similar articles" after the specially named articles. This paragraph went into the tariff act by amendment made from the Senate floor. It is possible that Congress sought to avoid complications which would arise in classifications if such a term was used. Paragraph 1446 of the Tariff Act of 1922 contained the provision: "Rosaries, chaplets, and similar articles of religious devotion, of whatever material composed * * *." Litigation resulted. See *Benziger Bros.* v. *United States*, 14 Ct. Cust. Appls. 270, T.D. 41883.

We are wondering what would be the attitude of the court toward the free admission of a chair identical with the one at bar which was imported, in good faith, etc., for use by the clergy in any of the churches where the chair is used only for seating purposes.